# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| CX REINSURANCE COMPANY LTD., | * | |
| Plaintiff | * | |
| v. | * | CIVIL NO. JKB-15-3054 |
| LEADER REALTY COMPANY *et al.*, | * | |
| Defendants | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM AND ORDER

Pending before the Court is Defendants' motion for reconsideration (ECF No. 66) of the Court's order (ECF No. 61) denying Defendants' motion to dismiss or, alternatively, for summary judgment (ECF No. 18). The motion has been briefed (ECF Nos. 78, 83), and no hearing is required, Local Rule 105.6 (D. Md. 2016). The motion is granted in that reconsideration has been undertaken; upon that reconsideration, though, the Court concludes that its early ruling was correct, and that ruling is now reaffirmed. Neither the statute of limitations nor laches bar Plaintiff's suit, which was filed October 7, 2015 (Compl., ECF No. 1). Because the Court considered evidentiary materials outside of the complaint, the Court properly treated the motion as one for summary judgment; the standard for summary judgment was previously stated in the memorandum opinion of November 22, 2016 (ECF No. 60), and need not be repeated here. But this memorandum and order provides a fuller statement of undisputed facts and analysis of cases relevant to the question of notice to CX Re within the context of the "discovery rule."

*I. Undisputed Evidence*

Defendants Charles Piccinini and Leader, Inc., lease various residential properties to tenants in Baltimore City. On July 11, 1997, they submitted an application for liability insurance to CX Re or its predecessor. (Defs.' Mot. Dismiss or Summ. J. Supp. Mem. 2, ECF No. 19; Pl.'s Opp'n 1, ECF No. 28.) On the application, the insurer asked the following question: "Has the Insured ever had any lead paint violations in the building(s)?" (Compl., Ex. 3, CNA International Reinsurance Co., Ltd., Supp. App'n Habitational Risks, ECF No. 1-3.) The box for "No" was checked. (*Id.*) The application was signed by Defendants Charles A. Piccinini and A.M. Slattery, and the "name of insured" was listed as Leader Realty *et al.* (*Id.*) The policy was issued, effective August 1, 1997, and covered a list of insureds, including Piccinini and Leader, Inc. ("Leader"), the original Defendants in this case. (Compl., Ex. 1, Policy, ECF No. 1-1.)

The policy also included a list of properties to which the liability insurance applied. (*Id.*) One of those properties was rented to a family and became the subject of a lead-paint liability suit against Leader and Piccinini. *Jenson v. Piccinini et al.*, Case No. 24C11007195, Circuit Court for Baltimore City, filed Nov. 15, 2011. (Defs.' Mot. Dismiss or Summ. J., Ex. 1, Stefani M. Andrews Certification ¶ 3, ECF No. 18-1.) The law firm of Parler & Wobber, LLP, in Towson, Maryland, represented Leader and Piccinini in defending the lawsuit. (*Id.* ¶ 7.) Parler & Wobber was engaged in late 2011 or early 2012 for this representation by third-party claims administrators. (*Id.* Ex. 2, Email P. Poholsky to W. Parler, ECF No. 21-2; Notice of Appearance, Case No. 24C11007195.)

According to Stephen McFeely, claims supervisor in York, Pennsylvania, at PRO IS, Inc. ("Pro US"), which is a Delaware corporation, Pro US employees and Lincoln General Insurance Company ("LGIC") employees acted as third-party claims administrators for CX Re; LGIC lent

some of its in-house claims adjustors to Pro US for the purpose of adjusting claims under policies issued by CX Re and other companies. (Pl.'s Opp'n, Ex. 1, McFeely Aff. ¶¶ 2, 3, May 13, 2016, ECF No. 28-1.) McFeely also stated,

> 4. The third-party claims administrators' duties were limited to the handling and adjustment of claims under innumerable insurance policies, including, but not limited to, Leader Realty Company's ("Leader") policies at issue in this litigation. These duties included, among others, retaining defense counsel, communicating with defense counsel about the insured's potential liability and exposure, setting reserves and, where the anticipated losses exceeded delegated authority, making reserve recommendations, processing claim payments, assessing whether tendered claims fell, or potentially fell, within the terms, limitations and conditions of the applicable policy or policies, and considering whether the insured's losses might be shared with or allocated to another insurer or the insured itself.
>
> 5. The third-party claims administrators had no involvement with underwriting, and they did not generate or maintain in the ordinary course of their duties applications or other underwriting materials. Their duties did not include identifying or analyzing possible rescission claims based on misrepresentations made on insurance applications.
>
> 6. On February 10, 2014, Pro US sent CX Re's London-based business manager, PRO Insurance Solutions Limited ("Pro UK"), a report on the *Jenson* lead exposure claim for the purpose of requesting settlement authority and the establishment of a commensurate loss reserve. Within that report was a mention of a lead violation notice issued in June 1997 to Leader's property at 2637 E. Madison Street.
>
> 7. Before February 10, 2014, the third-party claims administrators in Pennsylvania had no need for any authority from Pro UK and, thus, had no reason to act upon or communicate to Pro UK the information about that lead violation notice which they had received in the course of their claims handling.
>
> 8. Consequently, the third party claims administrators did not inform CX Re of Leader's June 1997 lead violation notice until February 10, 2014.

(*Id.*)

Marvin Mohn, who is a director, company secretary, and general counsel of CX Re, "a private limited company formed under the laws of England and Wales and with its principal

office in London, England," provided additional information about the relationship between Pro US and CX Re:

> 3. CX Re is a party to a Run-Off Management Agreement ("Agreement") with Tawa Management Limited ("Tawa Management"), a private limited company formed under the laws of England and Wales with its principal office in London, England. That Agreement appoints Tawa Management as the Manager of CX Re for all purposes, subject to the authority of CX Re's board of directors. Tawa delegated most—but not all—of its responsibilities to Pro Insurance Solutions Limited ("Pro UK"), a private limited company organized under the laws of England and Wales and headquartered and operating out of London, England. Pro UK, in turn, delegated some—but not all—of its claims-handling responsibilities and certain limited authorities to PRO IS, Inc. ("Pro US"), a Delaware corporation with operations in York, Pennsylvania.
>
> 4. Pro US's responsibilities did not include identifying or analyzing possible rescission claims based on misrepresentations made on insurance applications. Pro UK had that responsibility.
>
> 5. CX Re did not discover Leader's misrepresentation on the Application until August 2015, when, during the course of a broad underwriting review of many insureds, Pro UK was informed that the Baltimore City Health Department maintains a list of lead violation notices issued since at least the 1970s, obtained the list, and compared it to answers given in Leader's application for insurance.

(Pl.'s Opp'n, Ex. 2, Marvin Mohn Decl., May 16, 2016, ECF No. 28-2.)

On April 30, 2012, Parler & Wobber sent a report to the claims adjustor, summarizing the plaintiff's discovery responses in the *Jenson* case. The report included the statement, "The insured received a Lead Paint Violation Notice on June 25, 1997 from the Baltimore City Health Department. An abatement card was issued on July 24, 1997 after the property passed lead dust testing conducted by the Baltimore City Health Department." (Defs.' Mot. Dismiss or Summ. J., Ex. 3, Let. Wm. C. Parler, Jr., to P. Poholsky, Apr. 30, 2012, ECF No. 21-3.) Parler & Wobber also sent a defense report to the claims adjustor on August 24, 2012, and included in it a long list of dates and events pertaining to Jenson's apartment, including a notation of a notification from the Baltimore City Health Department of Jenson's elevated lead level and subsequent

4

correspondence and contacts with Leader pertaining to abatement. (*Id.* Ex. 5, Atty. Suit Rep't, Aug. 24, 2012, ECF No. 21-5.) In neither report did the law firm suggest placing blame on the insureds for the insurer's benefit.

## II. Analysis

Defendants contend the instant case is untimely. Specifically, they contend that CX Re had notice of Defendants' alleged misrepresentation on their insurance application more than three years before this case was filed. After closely reviewing many cases and then reflecting on the authority they provide, the Court rejects Defendants' contention.

The parties agree that the applicable statute of limitations is three years from the date of the wrong. (Defs.' Mot. Dismiss or Summ. J. Supp. Mem. 1; Pl.'s Opp'n 6.) Further, "[w]hen a case involves concurrent legal and equitable remedies, 'the applicable statute of limitations for the legal remedy is equally applicable to the equitable one.'" *Frederick Rd. Ltd. P'ship v. Brown & Sturm*, 756 A.2d 963, 985-86 (Md. 2000). Consequently, the timeliness of CX Re's suit, which seeks both rescission, an equitable remedy, and damages, a legal remedy, is determined by the governing statute of limitations, which is three years. *See* Md. Code Ann., Cts. & Jud. Proc. § 5-101 (West 2017).

An exception to "the date of the wrong" as the identifying event to begin the limitations period running is the "discovery rule." The rule applies generally in all civil actions brought pursuant to Maryland state law, and it provides that "the cause of action accrues when the claimant in fact knew or reasonably should have known of the wrong." *Poffenberger v. Risser*, 431 A.2d 677, 680 (Md. 1981). The *Poffenberger* court stated that "the discovery rule contemplates actual knowledge—that is express cognition, or awareness implied from 'knowledge of circumstances which ought to have put a person of ordinary prudence on inquiry

5

[thus, charging the individual] with notice of all facts which such an investigation would in all probability have disclosed if it had been properly pursued.'" 431 A.2d at 681 (citations omitted) (alteration in original). The court relied upon a much older case to provide greater definition to the type of knowledge that constitutes actual knowledge; in *Baltimore v. Whittington*, 27 A. 984 (Md. 1893), the Maryland Court of Appeals opined,

> Notice is of two kinds -- actual and constructive. Actual notice may be either express or implied. If the one, it is established by direct evidence, if the other, by the proof of circumstances from which it is inferable as a fact. Constructive notice is, on the other hand, always a presumption of law. Express notice embraces not only knowledge, but also that which is communicated by direct information, either written or oral, from those who are cognizant of the fact communicated. Implied notice, which is equally actual notice, arises where the party to be charged is shown to have had knowledge of such facts and circumstances as would lead him, by the exercise of due diligence, to a knowledge of the principal fact. . . . It is simply circumstantial evidence from which notice may be inferred. It differs from constructive notice, with which it is frequently confounded, and which it greatly resembles, in respect to the character of the inference upon which it rests; constructive notice being the creature of positive law, resting upon strictly *legal* presumptions which are not allowed to be controverted, whilst implied notice arises from inference of *fact*.

*Id.* at 985 (internal quotation marks and citations omitted), *quoted in Poffenberger*, 431 A.2d at 680.

Further, the *Poffenberger* court said, "As the knowledge imputed by the just defined constructive notice, if deemed to be sufficient to activate the running of limitations, would recreate the very inequity the discovery rule was designed to eradicate, we now hold this type of exposure does not constitute the requisite knowledge within the meaning of the rule." *Poffenberger*, 431 A.2d at 681. This point was reiterated by the court in *Windesheim v. Larocca*, 116 A.3d 954, 963 (Md. 2015): "Constructive notice is notice presumed as a matter of law. Unlike inquiry notice, constructive notice does not trigger the running of the statute of limitations under the discovery rule." *See also Anne Arundel Cty. v. Halle Dev., Inc.* 971 A.2d

6

214, 227 (Md. 2009) ("The discovery rule does not contemplate constructive notice, a creature of positive law, resting upon strictly legal presumptions which are not allowed to be controverted." (Internal quotation marks omitted.)).

Defendants contend that the April 30, 2012, notice to Pro US in the *Jenson* case of the 1997 pre-application, lead-paint violation constituted actual notice to CX Re and, consequently, its filing suit on October 7, 2015, was more than three years after notice, making this suit untimely. Defendants rely upon an oft-stated principle that the knowledge of an agent is imputed to the principal. *See, e.g.*, *Lohmuller Bldg. Co. v. Gamble*, 154 A. 41, 43 (Md. 1931) ("It is axiomatic that the knowledge of an agent as to any matter within the scope of his authority is the knowledge of his principal.") Defendants also cite a footnote in a Fourth Circuit case that cited a footnote in a Maryland Court of Appeals case that stated, "The knowledge imputed to the principal is considered actual knowledge." *See Plitt v. Kellam*, 160 A.2d 615, 619 n.4 (Md. 1960), *cited in Martin Marietta Corp. v. Gould, Inc.*, 70 F.3d 768, 773 n.4 (4th Cir. 1995).

It should be noted that the *Plitt* case did not involve a question as to the statute of limitations or the discovery rule; instead, it dwelt on the question of whether a principal could be considered a holder in due course on a promissory note when his agent, who obtained the note making the principal the payee, made unauthorized changes to the note, contrary to the maker's instructions to the principal's agent. The *Plitt* court said, "There can be no doubt that Blacker was Plitt's agent and his knowledge, acquired in the course of the agency, was Plitt's knowledge, . . . since Blacker had no independent interest adverse to that of Plitt to prevent the working of the rule," 160 A.2d at 619 (internal citation omitted; citing *Lohmuller Bldg. Co. v. Gamble*). The *Gamble* case also did not involve the statute of limitations or the discovery rule. It, too, involved an issue as to a holder in due course of a promissory note, but there, the court found the

7

purported agent of the payee bank was not operating as the bank's agent since he had an adverse interest to the bank; consequently, his knowledge could not be considered the bank's knowledge. 154 A. at 43-44.

The *Plitt* court included in the earlier-mentioned footnote that stated, "The knowledge imputed to the principal is considered actual knowledge," the following quotation from the *Whittington* case:

> Notice to the attorney, as well as notice to the deputy, was notice to the collector, and was actual, and not merely constructive notice to him, for the principal is bound by and affected with notice to his agent; and he is equally bound by notice received by his attorney in the same transaction.

*Whittington*, 27 A. at 985, *quoted in Plitt*, 160 A.2d at 620 n.4. *Whittington*, like *Plitt* and *Gamble*, was also not a case involving either the statute of limitations or the discovery rule. The relevant facts in *Whittington* were that the Baltimore City tax collector filed a petition in a foreclosure proceeding, indicating that taxes for certain years "were in arrear upon the property '*decreed to be sold*,'" referring to a foreclosure proceeding against a leasehold estate that was subject to a mortgage, which had not been timely paid. 27 A. at 984. A Baltimore City ordinance required the collector, when seeking the payment of outstanding taxes through the forced sale of lots that were subject to certain leasehold estates, to first sell only the leasehold interest, if sufficient to pay the taxes, but if insufficient, then to sell the whole fee simple estate; however, that provision did not apply in two circumstances, one of which was unless the collector had actual notice of the lease prior to the sale of the leasehold estate. *Id.* Despite the fact that the foreclosure proceeding was only against the leasehold interest, the collector, without first trying to sell only the leasehold estate, sold the whole fee simple estate to the city, which, in turn, conveyed ownership of the fee to a purchaser. *Id.* The petition was signed by the city solicitor, as attorney for the collector, and sworn to by the deputy collector. *Id.*

The *Whittington* court found this was not a case of constructive notice, and it was

> not pretended that the city collector had express notice, or knowledge personally, of the existence of the leasehold estate. But he became a party to the equity proceeding, wherein a decree had been passed directing a sale of the leasehold interest. He did more. He asked, notwithstanding the decree had been long before signed and enrolled, that he be permitted to sell for the non-payment of taxes, under the summary process of distraint, the identical property previously decreed to be sold, and no other or different interest. And the property which had been thus previously decreed to be sold was not the fee simple, but only the leasehold interest in the lot in question. He obviously knew there was a proceeding pending in the Circuit Court of Baltimore City, having for its object the sale of *some* interest in the property. He knew, further, the equity proceeding interfered with the execution of his distraints, and he applied to the Court for leave to proceed, in spite of the decree, to sell the same property which had been decreed to be sold. We say he knew these things, and we say so not because the record shows that he was personally aware of them, as matters of actual knowledge, but because the deputy city collector and the collector's attorney, both of whom were his agents in this transaction, did have such knowledge—the one having sworn to the facts stated in the petition, and the other having signed the petition itself. So both the attorney and the deputy collector knew, or at least were in possession of facts which would necessarily lead, upon the exercise of the slightest diligence, to a knowledge or notice, of the existence of the lease. They must therefore be regarded as knowing that which, with ordinary diligence, they might have known, or that which they were conscious of having the means of knowing. This result is not a legal presumption, but an inference of fact, and it seems to us an irresistible inference. . . . At all events, the exercise of ordinary diligence would most assuredly have informed both of these agents of the collector of every fact which the records in the equity case disclosed, and among those facts was the material and important one that the lot was subject to a lease for ninety-nine years, renewable forever. It is consequently a legitimate inference of fact that both of these representatives of the collector knew what the record in the foreclosure case disclosed as to there being a leasehold estate in Weber, and not a fee. And this was implied actual notice.

27 A. at 985.

The Court has taken some pains to delve into the operative facts of these cases because they mattered to the Court of Appeals's analysis on the question of actual notice. And the operative facts of *Whittington* reflect clearly that mere constructive notice was not the proper conclusion in that case. That is consistent with the even earlier case of *Adams' Express Co. v. Trego*, 35 Md. 47 (Md. 1872), in which the court said,

> It is true, notice to an agent of facts arising from and growing out of the subject-matter of his agency, is constructive notice to the principal. But this rule has no application to the case where the question is, whether the act relied on to bind the principal, was done within the limits and scope of the agent's authority or not. If knowledge of the agent could fix liability upon the principal in such case, irrespective of the limit of the former's authority, the cases of *Grant vs. Norway,* 10 *C. B.,* 665; *Hubbersty vs. Ward,* 8 *Exch.* 330; *Coleman vs. Riches,* 29 *Eng. L. & Eq. Rep.* 323, and many other cases to which reference could be made, would have resulted in very different judgments from what they did.

*Id.* at 68.

Thus, Defendants' preferred blanket rule that notice to an agent is notice to a principal is not reflected in the more nuanced analysis by the Maryland courts on the subject. An agent is not necessarily an agent for all intents and purposes; instead, an agent is an agent for the limited purposes entrusted to him by the principal. Knowledge gained by the agent that is material to the performance of the agent's duties within the scope of the agent's authority can be considered knowledge of the principal. The burden is upon the party seeking to rely upon the agency to provide evidence of the existence of agency and the nature and scope of the agent's duties. *Kennedy v. Mut. Life Ins. Co.*, 159 A. 780, 782 (Md. 1932) ("But the existence of such authority is ordinarily a subject of proof rather than of presumption. Its possession by a claim agent or his assistant is not necessarily inferable merely from that designation of his position."). Notice must be within the scope of the agent's authority or it is not notice to the principal.

Applying those principles to the instant case, Defendants have the burden of proving that Pro US was authorized to research and make recommendations to CX Re about legal action against Defendants for having made a misrepresentation on their underwriting application for liability insurance. In that context, the April 30, 2012, notice to Pro US of the 1997 lead-paint violation notice from Baltimore City Health Department, or that of August 24, 2012, would have been material to the performance of Pro US's duties within the scope of its authority. As can be

readily determined from the available, undisputed evidence, however, Pro US was not charged with that responsibility. Consequently, neither the April 30, 2012, nor the August 24, 2012, notice to Pro US constituted the requisite notice to CX Re to start the limitations period running for this case. Pertaining to this case, the April 30, 2012, notice and the August 24, 2012, notice remained merely constructive notice and did not rise to the level of actual notice. And constructive notice does not suffice to trigger the statute of limitations. Either the February 10, 2014, notice by Pro US to Pro UK or the later discovery in August 2015 of the misrepresentation is the triggering event. Since both dates are within the limitations period, it is unnecessary for the Court to decide which event governs the case.

The Court's conclusion that this action was timely filed is consistent with Maryland case law as to the statute of limitations specifically as well as to principal-agent notice generally. *See, e.g.*, *Dickerson v. Longoria*, 995 A.2d 721, 735-40 (Md. 2010) (agent's authority limited to authority granted by principal; agent had some authority to make decisions on principal's behalf, but only in a limited fashion, and agent's signing of agreement for principal to arbitrate was not within scope of agent's authority); *Halle Dev.*, 971 A.2d at 230 (presumed knowledge of ordinance, *i.e.*, constructive notice, not equal to knowledge of facts sufficient to prompt inquiry for purposes of discovery rule); *O'Hara v. Kovens*, 503 A.2d 1313, 1325 (Md. 1986) ("[B]eing 'on notice' means having knowledge of circumstances which would cause a reasonable person *in the position of the plaintiffs* to undertake an investigation which, if pursued with reasonable diligence, would have led to knowledge of the alleged fraud." (Emphasis added.)); *Unsatisfied Claim & Judgment Fund Bd. v. Fortney*, 285 A.2d 641, 646, 648 (Md. 1972) ("The principal is affected by the agent's knowledge, only if the agent in failing to impart the knowledge has failed to act properly within the scope of his authority."; "We construe the agency here to be one

limited in scope, which did not include the right to receive notice of a default judgment."); *Brown v. Hebb*, 175 A. 602, 608 (Md. 1934) ("In considering the existence and extent of his authority, the purpose for which he was employed, whether the admissions were relevant to and necessarily involved in negotiations for that purpose, whether they related to a disputed fact relevant and material to the negotiations, whether they were casual, mere loose talk, or intended to influence the negotiations, the course or the procedure of litigation, are all factors to be considered, none of which is necessarily conclusive, but any of which may be under appropriate facts and circumstances."); *Kennedy*, 159 A. at 782 (claim involved in case "not such as would customarily arise in the course of a claim agent's experience. It presented an extraordinary problem, for the solution of which the powers incident to the performance of his usual duties could not, in our judgment, be properly assumed to be adequate."); *Goebel v. German Am. Ins. Co. of Pa.*, 96 A. 627, 630 (Md. 1916) (agent's knowledge imputed to principal consistent with scope of agency); *Schwind v. Boyce*, 51 A. 45, 47 (Md. 1902) (general rule that principal is bound by agent's knowledge ceases when it is not agent's duty to communicate particular knowledge); *Wm. Devries & Co. v. Shumate*, 53 Md. 211, 215 (Md. 1880) (knowledge of facts by agent material to transaction for which agent is employed, and if agent has duty to communicate such facts to principal, is chargeable to principal); *Adams' Express*, 35 Md. At 67 ("The most guiding principle in the construction of [an agent's] powers, is to be derived from a consideration of the *purpose* which the agent . . . *is appointed to accomplish*.").

## III. Conclusion

For the reasons stated, Defendants' motion for reconsideration (ECF No. 66) is GRANTED in that reconsideration has been undertaken herein. However, upon that reconsideration the Court REAFFIRMS its denial of Defendants' motion to dismiss for failure to

state a claim or, in the alternative, for summary judgment. (ECF Nos. 60, 61.) Defendants Piccinini and Leader SHALL ANSWER CX Re's Second Amended Complaint within fourteen days of the date of this order.

    SO ORDERED.

DATED this 12th day of May, 2017.

                                                                  BY THE COURT:

                                                              _____/s/_____
                                                              James K. Bredar
                                                              United States District Judge